**LAKEFRONT TRUST, INC., et al.,**
**Appellants,**

**v.**

**CITY OF PORT ARTHUR, Texas and the**
**State of Texas, Appellees.**

**No. 7502.**

Court of Civil Appeals of Texas,
Beaumont.

Feb. 7, 1974.

Rehearing Denied Feb. 28, 1974.

DeLange, Hudspeth, Pitman & Katz, Minter & Mahon, Houston, Sheedy, Cureton, Westbrook, Lovelace & Nielson, Waco, for appellants.

Baker & Botts, Houston, J. Arthur Sandlin, Austin, George Wikoff, City Atty., Port Arthur, for appellees.

STEPHENSON, Justice.

The City of Port Arthur and the State of Texas, as plaintiffs, brought this suit in trespass to try title against Lakefront Trust, Inc., and numerous other parties, as defendants. Recovery of title and possession to two tracts of land in Jefferson County containing 3230.7 acres and 1364 acres, respectively, were sought. The City claimed ownership of the surface, and the State claimed ownership of the oil, gas, and other minerals. The 1364 acre tract is commonly known as "Pleasure Island." Trial was before the court, and judgment was rendered for plaintiffs that they recover title and possession to all of the 3,230.7 acre tract, and to that portion of the second tract (1,167.314 acres) lying north and west of Mud Bayou, and that plaintiffs take nothing as to that portion of the second tract (196.686 acres) lying south of Mud Bayou. Findings of fact and conclusions of law were filed by the trial court. The parties will be referred to here as they were in the trial court.

Pleasure Island is bounded on the south and west by the Port Arthur Ship Channel and the Sabine Neches Waterway and, on the north and east by Sabine Lake. The 3230.7 acre tract consists of land, completely under water, lying in the bed of Sabine Lake and bounded by Pleasure Island on the south and west and a retaining levee constructed in Sabine Lake by the U.S. Corps of Engineers. Such underwater tract is being covered with spoil from time to time, and it is contemplated that it will ultimately become dry land as a result of spoil deposits.

Plaintiffs offered in evidence a certified copy of Senate Bill 285, 60th Legislature, 1967, Regular Session, signed by the Governor on May 19, 1967, providing for the sale of and issuance of a patent to the City of Port Arthur with all oil, gas, and other minerals reserved to the State covering three tracts of land, two of which were sued for in this suit. Plaintiffs then offered in evidence a certified copy of the patent from the State to the City of Port Arthur conveying title to the same three tracts of land, such patent signed by the Governor and the Land Commissioner on June 6, 1967.

The defendants offered in evidence the field notes and patents, dated between the years 1838 and 1881, to the following surveys: Dennis Gahagan, Nicholas Coleman, Pedro de la Garza, South John Bennett, North John Bennett, B. C. Arthur, and Isaah Bray. The trial court found that the eastern boundary of each of these surveys (hereinafter called "Ancient Surveys") was the west bank of Sabine Lake.

The trial court found, and there is evidence to support the finding, that those surveys eroded westerly 500 feet by the year 1898. At that time a ship channel was built, partially in the lake and in part over land, leaving a small sliver of land east of the channel. Thereafter, from time to time the channel was dredged and widened, and much of the spoil was cast into the lake to the east, and all of the original

land in the lake was gone, and Pleasure Island was created. A part of Pleasure Island extends over the area formerly occupied by the Ancient Surveys. There is evidence to support a finding that from Mud Bayou north, there is no land which was originally a part of the mainland, and that all of the land on the lake side of the ship channel is a result of dredging the ship channel.

The real center of controversy in this case is a question which we believe is one of first impression in this state. Stated as simply as possible: Is the title to land eroded away by encroachment of the waters of a lake lost by the owners to the State of Texas so that later, when an island is man-made at the same location, the title to such new land remains vested in the state? We hold that it does.

We have made a careful study of all of the cases cited to us, and that we have found. The case cited most frequently is State v. Balli, 144 Tex. 195, 190 S.W.2d 71 (1944). This is a suit brought by the state to recover title and possession to Padre Island. Balli claimed under a grant from the State of Tamaulipas in 1829, plus the upland formed by accretion. The Supreme Court held that when land is formed by accretion, such land belongs not to the government, but to the owner of the upland estate. This general statement of law is found:

"If the sea encroached and the upland owner lost his land, he had no redress; if alluvion formed adjoining the seashore, the latter receded with the tide line, and by the very nature of the accretion any new alluvion which formed above the tide line should become a part of the contiguous upland estate." (190 S.W.2d at 100)

One year earlier, the Supreme Court handed down its opinion in Lorino v. Crawford Packing Co., 142 Tex. 51, 175 S.W.2d 410 (1943). This was a suit in trespass to try title to a strip of land, 80 feet wide and 900 feet long, extending from the shore out into Tres Palacios Bay. Under a permit from the Federal Government, an oyster house and pier were constructed out into the bay. Oysters were opened and the shells cast into the sea until many years later the top of the bank of shells was raised above the surface of the water. The current of the bay built up the oyster bed with sand and silt so that it became dry land by the time this suit was filed. After making the generally accepted statement of law that the soil under navigable waters belongs to the State, the Court stated that this submerged land was changed to dry land by artificial means. This Court then held specifically that land which was added to the shoreline by artificial means does not belong to the upland owners but remained the property of the State.

In 1955, Giles v. Basore, 154 Tex. 366, 278 S.W.2d 830 (1955), came before the Supreme Court. This case involves land in the delta of Trinity River. In an opinion appearing in this case, the Court held that the tracts of land which were formed by deposits of silt, soil, and logs arising from the floor of the bay and never a part of the mainland were property of the State. That other tracts of land extended by gradual and imperceptible deposition of silt, soil, and logs belonged to the owners of the upland.

The Supreme Court had occasion to write further on the subject in Luttes v. State, 159 Tex. 500, 324 S.W.2d 167 (1958). Here plaintiffs sued the State to recover title to 3400 acres of mud flats alleged to be accretions to the mainland on the westerly edge of Laguna Madre. We find these two statements:

"But there remains the vital question as to the character and distribution of the accretions, because admittedly the mere fact that the area in suit has become upland or fast land does not make

it the land of the petitioners-plaintiff. Presumptively it is the land of the State, and the burden rested upon the petitioners-plaintiff to prove that it was a true accretion in the sense of a natural and imperceptible deposit and that it was an accretion to the original boundary of the grant." (324 S.W.2d at 187)

"But, as clearly deducible from Giles v. Basore, 154 Tex. 366, 278 S.W.2d 830, supra, and the authorities therein cited, the mere fact that fast land has arisen by accretion and even adjoins the older upland does not necessarily make it the property of the upland owner. If the process starts at an island or creates an island or a high point in the sea bottom and from there moves toward the older upland or mainland, becoming fast land as it goes, this new fast land is undoubtedly the property of the State." (324 S.W.2d at 189)

The Houston Court of Civil Appeals in 1960 wrote on the subject in Seabrook Land Company v. Lipscomb, 331 S.W.2d 429 (Tex.Civ.App., Houston, 1960, no writ). This is a suit to enjoin construction of a pier which plaintiff alleged would interfere with his riparian rights. When plaintiff purchased his lot, it was connected to a reservation area which was later eroded away but partly removed by dredging a slip. This court quotes the rule that when a river by erosion occupies land previously unoccupied by it, the owner loses the title to the submerged land. Citing Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438 (1932), and Hancock v. Moore, 135 Tex. 619, 146 S.W.2d 369 (1941).

Applying the law expressed in these cases to the factual situation before us, the title to the 500 feet of land which had eroded away was lost to the owners of the Ancient Surveys and was vested in the State by the year 1898. According to generally accepted case law in this State, the shoreline was at mean high tide, and title to the submerged land was vested in the State.

There is no evidence that the process of accretion added any land to the remaining land owned by defendants; but, on the contrary, the width of the navigable stream separating Pleasure Island from the mainland has increased in size. We learned from Luttes v. State, supra, as quoted above, that even if Pleasure Island had increased in size through accretion and had become attached to the mainland, defendants still could not recover. The statement concerning Lorino v. Crawford Packing Co., supra, shows that defendants would not have benefitted from any addition to their land by artificial means, as the Supreme Court held such land remained the property of the State. Apparently, the only way defendants could have regained title to the land lost by them through erosion would have been for the land to have been rebuilt from the mainland out by accretion. There is no evidence that that type of accretion took place.

The only discord we have found appears in two Court of Civil Appeals' cases. In Fisher v. Barber, 21 S.W.2d 569 (Tex.Civ. App., Beaumont, 1929, no writ), some land in Trinity Bay became submerged land after the title passed out of the State, and that court held that the title remained in the owner. Then in Fitzgerald v. Boyles, 66 S.W.2d 347 (Tex.Civ.App., Galveston, 1931, dismissed), a mandamus, to compel the county surveyor to survey a tract of land so that the land could be purchased, was denied. The Court of Civil Appeals affirmed the trial court, citing Fisher v. Barber, supra, and made the statement that where land is made submerged land by encroachment, and then restored by either natural or artificial means, that the holders of the original title were paramount. However, on motion for rehearing the court stated that the above rule of law was true only if the land was restored through natural means, and not artificial. We have concluded that the subsequent Supreme Court cases cited in this opinion must be accepted as correct statements of

law where in conflict with these two older cases of the Courts of Civil Appeals.

■ Defendants have a series of points of error to the effect that plaintiffs failed to identify and locate on the ground the two tracts of land sued for. We pass upon the "no-evidence" points by considering only the evidence favorable to the findings and judgment of the court, and we pass upon the "insufficiency of the evidence" points by considering the entire record.

■ The City and the State called Matt M. Racki as their first witness. He testified that he was a registered professional engineer and a registered public surveyor since 1946 or 1947. He was employed to determine where the lines set out in the legislative act and patent actually fall on the ground. That description showed that tract two contained 3230.7 acres in Jefferson County, Texas, and was a part of State Tracts 32, 36, 37, 38, 39, 40, 41, and 42 in the Sabine Lake, and, beginning at a point in the southwest line of the H. L. McKee Survey, with certain latitudes and longitudes. The description contained an "X and Y" which have reference to the Lambert coordinate system. There follows a lengthy metes and bounds description of the land conveyed. A contract was made with a firm known as Wallace Aerial Surveys to make an aerial map of such land. Racki and his crew ran an actual survey on the ground, a closed traverse to establish points on the ground. These points are spaced on the ground so that each plat, which is twelve by twelve, had three points on it. When completed they had a scale mosaic aerial photograph of the entire area. The control points were sheets of plywood eight by eight, painted white and fastened to the ground. They started at the northeast side of the

golf course and ran down Pleasure Island at six points. They came on down the island to the bridge that goes into Louisiana. They came across the canal and across Highway 87 and ran points on Highway 87 to a point directly west of Gulf Oil Company's office. They then ran points down the road on Gulf property. They moved north, got on Thomas Boulevard, all the way back to the extension of the old Beaumont Highway, and back across and down and tied the survey. The aerial photographs when put together reflected to scale the area showing Pleasure Island. The photographs were taken in July, 1970, and accurately reflect the ground as it existed when the photographs were taken. They checked around the island and across the island in various places. They ran a closed traverse, a complete survey down, across, and back up on the mainland with several intermediate checks to be sure they were getting it accurately in both directions. An overlay was prepared and plotted using the metes and bounds descriptions set out in the legislative enactment and patent to the City. In order to superimpose the overlay upon the aerial photographs, they plotted the longitude and latitude lines on either end and plotted in the most westerly corner of the H. L. McKee Survey. The north line of the McKee is along the west line of Pleasure Island. That information was furnished to Racki by the City of Port Arthur. The points of error that plaintiffs failed to identify and locate the land on the ground are overruled.

We have carefully considered the remaining points of error and have found no merit to them. They are overruled.

Affirmed.

KEITH, J., not sitting.